# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 02/26/2013

INDEX NO. 151698/2013

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 02/26/2013

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OKSANA S. BAIUL
OKSANA, LTD

Plaintiffs,

-against-

STEPHEN DISSON
DISSON SKATING, LLC

Defendants

SUMMONS AND COMPLAINT

Raymond J. Markovich, Esq.
Attorney for Plaintiff
351 Westbourne Drive
West Hollywood, CA 90048
(323) 401-8032

Dated: February 26, 2013

Certified per 22NYCRR § 130-1.1(a)

Attorney for Plaintiff
Raymond J. Markovich, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X

OKSANA S. BAIUL                                        :         Index No.
OKSANA, LTD

                                     Plaintiffs.        :

                    -against-                           :
                                                                Summons

STEPHEN DISSON    :
DISSON SKATING, LLC
                                                                Date Index No. Purchased:

                                     Defendants
----------------------------------------------------------------X

MR. STEPHEN DISSON
President & CEO
Disson Skating, LLC
1420 Beverly Road
McLean, VA 22101

DISSON SKATING, LLC
1420 Beverly Road
McLean, VA 22101

       You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

       The basis of venue is that Defendants transact business and or supply services in the State of New York and such transaction of business and or supply of services are/is regular and continuing.

Dated: West Hollywood, CA
       February 26, 2013

                                    _____
                                    Raymond J. Markovich, Esq.
                                    Attorney for Plaintiff - Oksana S. Baiul
                                    351 Westbourne Drive
                                    West Hollywood, CA 90048
                                    (323) 401-8032

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
                                                              :
OKSANA S. BAIUL                                               :
OKSANA, LTD                                                   :
                                                              :    Index No.
                                    Plaintiffs,              :
                                                              :
               -against-                                     :
                                                              :    **COMPLAINT**
                                                              :
STEPHEN DISSON                                               :
DISSON SKATING, LLC                                          :
                                                              :
                                    Defendants               :
                                                              :
-------------------------------------------------------------------------X

       Plaintiffs, Oksana S. Baiul ("Plaintiff") and Oksana, LTD. ("Plaintiff LTD)", by their attorney, Raymond J. Markovich, Esq., allege as follows:

## FACTS COMMON TO ALL CLAIMS

1.    Plaintiff resides in Bucks County, the Commonwealth of Pennsylvania. An affidavit executed by Plaintiff is attached hereto as Exhibit 1 and incorporated herein by this reference as though set forth at length. Plaintiff LTD is a Pennsylvania corporation owned 100% by Plaintiff and it is the legal entity that has been utilized and continues to be utilized by Plaintiff for some or all of Plaintiff's contracts and business. In the world of entertainment. Plaintiff LTD would be deemed Plaintiff's "loan-out" company although it is also an operating entity engaged in various lines of business. Plaintiff and Plaintiff LTD shall be collectively referred to as "Plaintiffs".

2.      Plaintiff, originally from the Ukraine, is a world famous figure skater, actress, entertainer, designer and philanthropist who won the 1993 World Championship - Ladies Figure Skating at the age of 15 years old and became the 1994 Olympic Gold Medalist, in Ladies Figure Skating, at the age of 16 years old, the second youngest in history to win after Sonja Henie who was 15 years old in 1928. Plaintiff has performed as a headlining star in over 911 figure Skating Shows, 6 films, approximately 300 television programs and numerous commercials that aired thousands of times. Many of the films and/or television programs have been licensed and/or syndicated worldwide. Plaintiff also has 2 published books that have sold copies around the world and the Plaintiff owns the Oksana Baiul Collection, the top selling independent figure skating apparel and accessories lines globally. An affidavit executed by Plaintiff's business manager, ("Business Manager"), is attached hereto as Exhibit 2 and incorporated herein by this reference as though set forth at length (See Exhibit 1).

3.      In early June through the end of August 2011, Plaintiff did not have an agreement, signed or otherwise, with The Agency Group (with offices in New York, NY) and/or Steve Martin (who works in The Agency Group's New York, NY offices) for it and/or him to represent her as an agency and/or agent. They were negotiating a talent agency agreement but never agreed on terms or concluded a talent agency agreement. So Defendant Stephen Disson's statement in the February 4, 2013 New York Daily News Article concerning Plaintiff's agent calling Defendant Stephen Disson is false for several reasons including that Steve Martin was not Plaintiff's agent and The Agency Group was not Plaintiff's agency (See Paragraphs 29-31 below and Exhibits 1 and 6).

4.    Upon information and belief, Defendant Stephen Disson ("Defendant Stephen Disson") is a Producer, an employee and the President and CEO and, upon information and belief, a Member controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, LLC ("Defendant Disson Skating"). An Article from the City of Jamestown, New York website posted July 27, 2012 naming Defendant Stephen Disson as the President and CEO of Defendant Disson Skating and describing Defendant Disson Skating's business in Jamestown, NY, including a photograph of Defendant Stephen Disson with the Mayor of Jamestown, NY, is attached hereto as Exhibit 3 and is incorporated herein as though set forth at length.

5.    Upon information and belief, Defendant Stephen Disson is an individual that works and/or has worked for Disson Skating in the State of New York and/or is doing business in the State of New York and/or transacts business in the State of New York and/or has done regular and continuing work for Defendant Disson Skating in the State of New York and/or business with NBCUniversal Media, LLC and/or NBC Sports Network, LP and/or a subsidiary or related company of NBCUniversal Media, LLC (collectively "NBC") in the State of New York and/or others in the State of New York for several years. Advertising from Defendant Disson Skating's website is attached hereto as Exhibit 4 and is incorporated herein as though set forth at length (See Exhibit 3).

6.    Defendant Disson Skating and Defendant Stephen Disson shall be referred to collectively as the "Defendants".

3

7.    Upon information and belief, Defendant Disson Skating is a Commonwealth of Virginia limited liability company that is doing business in the State of New York and/or transacts business in the State of New York. One of Defendant Disson Skating's most recent live skating shows was produced by Defendant Stephen Disson and/or Defendant Disson Skating in Jamestown, New York on December 15, 2012 (originally announced as December 12, 2012) and broadcast and/or to be broadcast nationwide and in New York State by NBC (See Exhibits 3 and 4 and Paragraphs 4 and 5 above).

8.    Upon information and belief, Defendant Disson Skating has done regular and continuing business with NBC and/or others in the State of New York for several years and/or transacts business in the State of New York for several years (See Exhibits 3 and 4 and Paragraphs 4, 5 and 7 above).

9.    On February 1, 2012, Plaintiff filed in the Supreme Court of the State of New York in the County of New York a summons and complaint (Index No. 151051/2013) against Defendant Disson Skating and NBCUniversal Media, LLC and NBC Sports Network, LP. In such complaint, there were numerous causes of action but some or all related to violations by Defendant Disson Skating and/or NBCUniversal Media, LLC and/or NBC Sports Network, LP of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) ("NBC/Disson Complaint"). A copy of such summons and complaint is attached hereto as Exhibit 5 and is incorporated herein as though set forth at length.

10.    In an Article dated February 4, 2013 in the New York Daily News ("Daily News Article"), Defendant Stephen Disson communicated and/or published to a reporter at the New

4

York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement that *his company never publicly disclosed his negotiations to have Bahi [Plaintiff] appear.* This statement is false. (See Exhibit 1). In fact, Defendant Disson Skating had publicly disclosed and/or advertised that Plaintiff was a headlining star, and although false, this is about as far as one could ever take any negotiations (See Paragraphs 31-33 below and Exhibits 13-15). A copy of the Daily News Article is attached hereto as Exhibit 6 and is incorporated herein as though set forth at length.

11    Defendant Stephen Disson's statement about Plaintiff in Paragraph 10 above is false and when such statement was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, knew such statement to be false and/or he acted in reckless disregard of such statement's truth or falsity and/or he communicated and/or published such statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. Proof of the foregoing is contained in a copy of an e-mail from Defendant Stephen Disson to Plaintiff dated August 8, 2011 whereby Defendant Stephen Disson admits in writing that he told numerous individuals and entities (that collectively have thousands of employees) about his negotiations with Plaintiff is attached hereto as Exhibit 7 and is incorporated herein as though set forth at length. (See Paragraph 4 above and Exhibit 3).

5

12.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 10 above is contained in the Pandora Marketing and Promotional Materials. Defendants were advertising Plaintiff as a featured skater in Defendants' Pandora Marketing and Promotional Materials beginning on or about July 13, 2011 and such Pandora marketing materials are attached hereto as Exhibit 8 and are incorporated herein as though set forth at length. Such advertising and/or promotion to promote the sale of Defendant Disson Skating's products included the use of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) (See Exhibit 5).

13.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 10 above is contained in the Improv On Ice Marketing and Promotional Materials where Plaintiff was advertised as a suggested feature skater beginning on or about July 13, 2011 and such Improv On Ice marketing materials are attached hereto as Exhibit 9 and are incorporated herein as though set forth at length. Such advertising and/or promotion, to promote the sale of Defendant Disson Skating's products, included the use of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) (See Exhibit 5).

14.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 10 above is contained in the Magic 98.9 Improv On Ice advertising a copy of which is attached hereto as Exhibit 10 and is incorporated herein as though set forth at length. Such advertising and/or promotion, to promote the sale of Defendant Disson Skating's products, included the use

of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) (See Exhibit 5).

15.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 10 above is contained in the WROQ-Rock 101 Improv On Ice advertising a copy of which is attached hereto as Exhibit 11 and is incorporated herein as though set forth at length. Such advertising and/or promotion, to promote the sale of Defendant Disson Skating's products, included the use of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) (See Exhibit 5).

16.    In the next sentence in the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement "*he's just weird...*" This statement made by Defendant Stephen Disson intentionally implies that Plaintiff is weird. Both Defendant Stephen Disson's statement and his implication are false. When such statement and/or implication was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO od Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, knew such statement to be false and/or he acted in reckless disregard of such statement's truth or falsity

and/or he communicated and/or published such statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. (See Exhibits 1 and 5).

17.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement that *Baiul [Plaintiff] had called him to say how much she appreciated his offer, given how poorly she had performed on prior shows*. This statement is false. When such statement was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or most of the membership interest or units of Defendant Disson Skating, knew such statement to be false and/or he acted in reckless disregard of such statement's truth or falsity and/or he communicated and/or published such statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. Plaintiff never said to Defendant Stephen Disson that she had performed poorly on prior shows and Plaintiff had not performed poorly on prior shows (See Exhibits 1 and 2).

18.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 17 above is that in the last two televised United States shows in which Plaintiff performed, Plaintiff received standing ovations for her performances (the only skater to get a standing

ovation) (one in the all-star for cancer "Frosted Pink" show and another in a "9/11 Fund" benefit show (See Exhibits 1 and 2).

19.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 17 above is that numerous journalists and publications bestowed critical acclaim to Plaintiff, including the New York Times, when she starred in an off-Broadway production in 2007 (See Exhibit 2).

20.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 17 above is that even though Plaintiff is a non-US figure skater, she was requested by the New York City Mayor's Office to aide in NYC's bid to host the 2012 Olympics and she donated her time for promoting such cause by traveling as far as Singapore (See Exhibit 2).

21.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement *"[e]ach time she had been a littl flaky."* Defendant Stephen Disson in this statement has wrongly labeled the Plaintiff as "flaky". This statement and the labeling made by Defendant Stephen Disson are both false. When such statement and/or labeling was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or most of the membership interest or units of Defendant Disson Skating, knew such statement and/or labeling to be false and/or he acted in reckless disregard of such statement's and/or labeling's truth or falsity and/or he communicated and/or published such statement and/or labeling in a grossly

9

irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. (See Exhibits 1 and 2).

22.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 21 above is supported by Defendant Stephen Disson's own conduct. In July and August 2011, Defendant Stephen Disson unsuccessfully tried to sign a contract with Plaintiff and/or Plaintiff LTD for Plaintiff to perform as a star in two of Defendant Disson Skating's shows. Defendant Stephen Disson surely would not have been trying to sign a contract with Plaintiff and/or Plaintiff LTD for Plaintiff to perform as a headlining star in two of Defendant Disson Skating's shows if Plaintiff had each time been a little "flaky" (See Exhibit 5).

23.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 21 above is supported by the facts stated in Paragraphs 18-20 above (See Paragraphs 18-20 above and Exhibit 2).

24.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement *"One time, she didn't show up. She was out shopping...."* These statements made by Defendant Stephen Disson are both false. With these statements, Defendant Stephen Disson has stated and/or implied that Plaintiff is a "no show" and labeled Plaintiff as such. When such statements, implication and/or labeling were communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or

units of Defendant Disson Skating, knew such statements, such implication and such labeling to be false and/or he acted in reckless disregard of such statements', such implication's and/or such labeling's truth or falsity and/or he communicated and/or published such statements, implication and/or labeling in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. Plaintiff has never failed to show up for a performance or show, when under contract, because she was out shopping and Plaintiff is not a "no show" (See Exhibits 1 and 2)

25.    Plaintiff, unlike most other figure skaters, reaches far beyond the ice and Defendant Stephen Disson's false statements negatively affect Plaintiffs globally. First, NBCUniversal Media, LLC, NBC Sports Network. LP and/or Disson Skating, LLC made Plaintiff look like a repeated "no show" by advertising Plaintiff as a star in two shows (Neither Plaintiff nor Plaintiff LTD was contracted to perform and Plaintiff did not perform in either show), for over 10 months or more, without Plaintiff's written consent. Being wrongly labeled as a repeated "no show" is devastating for Plaintiff's career and would be for that of any figure skater and/or other entertainer It is also extremely damaging to Plaintiff LTD. Then, to make the damage to Plaintiffs exponentially worse, Defendant Disson confirmed the "no show" labeling of Plaintiff by his false statement and/or false implication described in Paragraph 24 above (See Exhibit 2).

26.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 24 above is supported by the facts stated in Paragraph 2 above (See Paragraph 2 above and Exhibits 1 and 2)

11

27.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement "*[s]he was grateful for a third chance...."* This statement made by Defendant Stephen Disson implied that Plaintiff needed a third chance for some undefined reason and labeled Plaintiff as needing a third chance for some undefined reason. Defendant Stephen Disson's statement, implication and labeling are all false because Plaintiff never said to Defendant Stephen Disson that she was grateful for a third chance and Plaintiff never needed a third chance for any reason, defined or undefined. When such statement, implication and/or labeling were communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, knew such statement, implication and/or labeling to be false and/or he acted in reckless disregard of such statement's, implication's and/or labeling's truth or falsity and/or he communicated and/or published such statement, implication and/or labeling in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. (See Exhibits 1 and 2).

28.    Further proof of the falsity of Defendant Stephen Disson's statement implication and/or labeling in Paragraph 27 above is supported by the facts stated in Paragraphs 18-20 above (See Paragraphs 18-20 above and Exhibit 2).

29.    In an Article dated February 5, 2013 in the New York Post, Defendant Stephen Disson communicated and/or published to a reporter at the New York Post and/or to the New York Post, both the reporter and the New York Post were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement that *she [Plaintiff] approached him through an agent in mid-2011 and asked to be included in the shows, then backed out within weeks after he agreed - well before he started ads for them.* This statement made by Defendant Stephen Disson is false. A copy of the Article is attached hereto as Exhibit 12 and is incorporated herein as though set forth at length. When such statement was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, knew such statement to be false and/or he acted in reckless disregard of such statement's truth or falsity and/or he communicated and/or published such statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties (See Paragraph 3 above and Exhibits 1 and 2).

30.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 29 above is his own statement in the Daily News Article where he said "...I said I'd send a contract." Defendant Stephen Disson never sent a contract for Plaintiff to review. Plaintiffs did not agree on terms with Defendant Disson Skating and Plaintiffs never signed a contract with Defendant Disson Skating to perform in either show (See Exhibit 1, 2 and 6).

31.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 29 above is an e-mail from Steve Martin to Plaintiff dated July 8, 2011 where Steve Martin said that Defendant Disson inquired about his show for January. So according to Steve Martin, who was not Plaintiff's agent, Defendant Stephen Disson contacted him about Plaintiff possibly performing in Defendant Stephen Disson's January show. A copy of the e-mail is attached hereto as Exhibit 13 and is incorporated herein as though set forth at length.

32.    In the same New York Post Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Post and/or to the New York Post, both the reporter and the New York Post were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement *"[w]e never announced Oksana [Plaintiff] in either show or featured her in any of our advertising or promotional materials."* This statement made by Defendant Stephen Disson is false. When such statement was communicated and/or published, Defendant Stephen Disson, who is a Producer, an employee, President and CEO of Disson Skating and, upon information and belief, a Member of Defendant Disson Skating controlling all or a substantial portion of the membership interest or units of Defendant Disson Skating, knew such statement to be false and/or he acted in reckless disregard of such statement's truth or falsity and/or he communicated and/or published such statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. (See Exhibits 1, 2, 5 and 7-12).

14

33.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 32 above is supported by the facts stated in Paragraphs 11-15 above (See Paragraphs 11-15 and Exhibits 7-11).

34.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 32 above is supported by the fact that on February 2, 2012, NBC issued a press release for the Pandora NBC skating Series, that stated that the show was produced by Defendant Disson Skating in conjunction with NBC, that advertised the show for the Defendants. A copy of the press release is attached hereto as Exhibit 14 and is incorporated herein as though set forth at length. Such press release was used in advertising and/or promotion, to promote the sale of Defendant Disson Skating's products, and included the use of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) (See Exhibit 5).

35.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 32 above is supported by the fact that on February 2, 2012, The Entertainment Hotline published a story about the Pandora NBC skating Series, that stated that the show was produced by Defendant Disson Skating in conjunction with NBC, that advertised the show for the Defendants. Such story was used in advertising and/or promotion, to promote the sale of Defendant Disson Skating's products and included the use of Plaintiff's likeness, persona, picture, image, and/or name, within the State of New York without Plaintiff's written consent in violation of New York

15

Civil Rights Law Section 51 and 15 U.S.C.A Section 1125(a) and a copy of the story is attached hereto as Exhibit 15 and is incorporated herein as though set forth at length. (See Exhibit 5).

36.    Further proof of the falsity of Defendant Stephen Disson's statement in Paragraph 32 above is supported by a letter dated May 25, 2012 from Ms. Gillian Lusins, Vice President and Intellectual Property Counsel for NBC, acknowledging that Plaintiff should not have been included in the February 2, 2012 press release and placing blame for the release on the event organizer which was the producer, Defendant Disson Skating. Such letter is attached hereto as Exhibit 16 and is incorporated herein as though set forth at length.

37.    As a direct result of Defendant Stephen Disson's false statements about Plaintiff in the New York Daily News Article, there have been numerous written comments about Plaintiff. Plaintiff has been exposed to public hatred, contempt, ridicule and/or disgrace and/or discredit and/or injury in Plaintiff's occupation and/or profession. One comment said that Plaintiff "[s]ounds like an ambulance chaser." Another comment followed the prior comment with "sounds...i[sic] think she's [Plaintiff's] past that." Another comment said "[she probably needs money  That's two lawsuits in less than a month  Will not be surprised if she eventually files for bankruptcy. Her story is such a sad one." Another comment said "...time to grow up Oksana [Plaintiff]. Get a job." The comments from the New York Daily News Article are attached hereto as Exhibit 17 and are incorporated herein as though set forth at length (See Exhibit 5 and 6).

38.    In contrast, a Yahoo! News Article did not contain any false and defamatory statements from Defendant Stephen Disson about Plaintiff. Not surprisingly, a sampling of the

16

comments from readers was greatly supportive of Plaintiff as concerns the NBC/Disson Complaint. One reader wrote that "I am not a lawyer, but it seems to me she does have a case." Another wrote "[i]F[sic] NBC did what she said, then she should not only sue, but win. It's time to make the media accountable." Another wrote "If NBC used her [Plaintiff's] likeness in promotional literature they should have to pay her the $5 million and also issue a public apology for labeling her [Plaintiff] a "No Show". Another wrote. "[i]f she's [Plaintiff's] right, she wins" Another wrote "Oops. Someone is getting fired for that." Another wrote "[t]hey promoted the show using her [Plaintiff's] name and fame. They deserve to be sued." The Yahoo! News Article and the comments to it are attached hereto as Exhibits 18 and 19 respectively and are incorporated herein as though set forth at length.

39.    As a direct result of Defendant Stephen Disson's false statements about Plaintiff in the New York Daily News Article and/or The New York Post Article and/or other publications and/or websites and/or blogs and/or television and/or radio and/or other media. Plaintiff's Business Manager has received correspondence and/or e-mails and/or calls from all over the world informing him that these Articles and Defendant Stephen Disson's statements about Plaintiff are being talked and written about and reported in foreign publications and/or on foreign websites and/or in foreign blogs and/or on foreign television and/or on foreign radio and/or on other foreign media. Unfortunately, the foreign media does not yet know that all of Defendant Stephen Disson's statements about Plaintiff addressed in this Complaint and all Defendant Stephen Disson's implications and labeling of Plaintiff addressed in this Complaint are false (See Exhibit 2).

17

40.    Plaintiff's Business Manager has been alerted to horrible comments about Plaintiff being made on the figure skating blogs as a direct result of Defendant Stephen Disson's false statements (See Exhibit 2).

41.    Soon after Defendant Stephen Disson published his false statements, Plaintiff's Business Manager received an e-mail from a kind man in West Virginia offering for Plaintiff to do a meet and greet at an annual Halloween party he does and wanting to know a quote for her fee. He couldn't pay her much but it would be something. While of course Plaintiffs and the Business Manager appreciate any and all offers, and especially from a man so kind as him to have e-mailed to try and help Plaintiff in her perceived hour of need, but unfortunately, this kind man must have read one of the Articles containing Defendant Stephen Disson's false statements and/or false implications and/or false labeling about Plaintiff and/or comments in reaction to Defendant Stephen Disson's false statements and/or false implications and/or false labeling about Plaintiff and this kind man wrongly believed that Plaintiff was having financial problems. Plaintiffs have suffered severe damage, and will continue to be damaged, by Plaintiff having been labeled a "no show" by Defendant Disson Skating and/or NBCUniversal Media, LLC and/or NBC Sports Network, LP and then subsequently being attacked by Defendant Stephen Disson with false statements and/or false implications and/or false labeling about Plaintiff. (See Exhibit 2).

42.    Plaintiff's Business Manager was approached by a few friends and family members and asked last week if Plaintiff is OK. They had read that she is not showing up for shows (the NBC/Disson "no show" label) and that people are making really negative comments

18

about her. They could not understand why because Plaintiff had been so gracious and hospitable towards them when they had met her while guests at a private gathering. (See Exhibit 2).

43.    A woman that runs a non-profit called Plaintiff's Business Manager on February 6, 2013 and asked if Plaintiff was OK. The woman was appalled at the lies that were being reported about Plaintiff. She knows Plaintiff as a woman with a big heart who "shows up," refusing compensation to do surprise meet and greets for young and impoverished children learning figure skating who perform class shows for family and friends to exhibit the skills that they are learning on the ice (See Exhibit 2).

44.    On February 15, 2013, Plaintiff's Business Manager was asked by a potential counter-party to a big deal involving taking global the Oksana Baiul Collection (apparel and jewelry collections) if there is any truth in the statements by Defendant Stephen Disson in the press about Plaintiff not showing up to engagements because she was shopping? This is a valid concern for him because as part of the deal that they had been negotiating, Plaintiff would have to make numerous personal appearances to promote the product lines but the statements by Defendant Disson made Plaintiff look as if she is irresponsible and unreliable. He expressed further concerns that potential investors would have regarding statements in the press that Plaintiff is broke and/or "flaky." While this gentleman knows that Plaintiff is neither broke nor "flaky" and that in fact she is incredibly hard working, always either on time or early to meetings, very professional and that she gives 150%: Plaintiff's Business Manager still had to reassure him by citing examples such as how Plaintiff, after having surgery, was on the ice two days later doing performances against doctor's instructions  in order to honor a contract and not

19

disappoint fans. He then apologized for asking but said that things like these statements by Defendant Stephen Disson could deter investors and kill deals (See Exhibit 2).

45.    Plaintiff is one of the most talented and artistic, hard working, big hearted figure skaters ever. For over 10 years, she catapulted figure skating to new heights, heights that had never before been realized and in turn generated billions of dollars for the networks, executives, producers and numerous other businesses while also being the driving force behind the employment of thousands of individuals. It is so sad to see that a big beneficiary of Plaintiff's work like Defendant Stephen Disson is now making false statements, false implications and/or false labeling about Plaintiff and such false statements, false implications and/or false labeling about Plaintiff are severely damaging her personally, her career and Plaintiff LTD's business (See Exhibit 2).

## AS AND FOR A FIRST CAUSE OF ACTION

## DEFAMATION - LIBEL

46.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 45 of the Complaint with the same force and effect as if fully set forth at length herein.

47.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who

20

and/or which then published Defendant Stephen Disson's statement that *his company never publicly disclosed his negotiations to have Band [Plaintiff] appear.*

48.    The statement by Defendant Stephen Disson in Paragraph 47 was defamatory because it exposed Plaintiff to public hatred, contempt, ridicule and/or disgrace and discredit and/or injury in Plaintiff's occupation and/or profession.

49.    The statement by Defendant Stephen Disson in Paragraph 47 referred to the Plaintiff.

50.    The statement by Defendant Stephen Disson in Paragraph 47 was published.

51.    The statement by Defendant Stephen Disson in Paragraph 47 was false.

52.    When Defendant Stephen Disson made the statement in Paragraph 47, Defendant Stephen Disson knew that it was false or acted in reckless disregard of the truth or falsity of the statement.

53.    The statement by Defendant Stephen Disson in Paragraph 47 imputes incompetence and/or dishonesty by Plaintiff in Plaintiff's profession and/or is a substantial factor in causing Plaintiffs to suffer financial loss.

54.    As an employer, Defendant Disson Skating is vicariously liable for the torts of its President, CEO and employee, Defendant Stephen Disson, committed in the course of his employment.

55.    Defendants have caused Plaintiffs to suffer serious, irreparable harm and have caused Plaintiff to be held in public view as incompetent and/or dishonest, and as a direct and proximate result. Plaintiffs have suffered and continue to suffer severe damages, including but not limited to a loss of personal and professional reputation, personal humiliation, mental anguish and/or suffering for Plaintiff, and goodwill, lost earnings and lost potential earnings for Plaintiffs, all in a sum not less than one million ($1,000,000) dollars, attorney's fees, cost of suit and interest.

56.    In addition, the reprehensibility of Defendants' conduct, in knowingly and maliciously publishing such a defamatory statement in wanton and reckless disregard of the harm caused to Plaintiffs gives rise to punitive damages in favor of Plaintiffs and against Defendants in an amount to be determined by the Court.

## AS AND FOR A SECOND CAUSE OF ACTION

### DEFAMATION - LIBEL

57.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint with the same force and effect as if fully set forth at length herein.

58.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who

22

and/or which then published Defendant Stephen Disson's statement *"[i]t's just weird...."* This statement made by Defendant Stephen Disson intentionally implies that Plaintiff is weird.

59.    The statement by Defendant Stephen Disson and/or its intended implication in Paragraph 58 were defamatory because they exposed Plaintiff to public hatred, contempt, ridicule and/or disgrace and discredit and/or injury in Plaintiff's occupation and/or profession.

60.    The statement and/or its intended implication by Defendant Stephen Disson in Paragraph 58 referred to the Plaintiff.

61.    The statement and/or its intended implication by Defendant Stephen Disson in Paragraph 58 were published.

62.    The statement and/or its intended implication by Defendant Stephen Disson in Paragraph 58 were false.

63.    When Defendant Stephen Disson made the statement and/or its intended implication in Paragraph 58, Defendant Stephen Disson knew that they were false or acted in reckless disregard of the truth or falsity of the statement and/or its intended implication.

64.    The statement and/or its intended implication by Defendant Stephen Disson in Paragraph 58 imputes incompetence and/or dishonesty by Plaintiff in Plaintiff's profession and/or is a substantial factor in causing Plaintiffs to suffer financial loss.

23

65.    As an employer. Defendant Disson Skating is vicariously liable for the torts of its President. CEO and employee, Defendant Stephen Disson, committed in the course of his employment.

66.    Defendants have caused Plaintiffs to suffer serious. irreparable harm and have caused Plaintiff to be held in public view as incompetent and/or dishonest, and as a direct and proximate result, Plaintiffs have suffered and continue to suffer severe damages, including but not limited to a loss of personal and professional reputation, personal humiliation, mental anguish and/or suffering for Plaintiff, and goodwill, lost earnings and lost potential earnings for Plaintiffs. all in a sum not less than one million ($1,000,000) dollars, attorney's fees, cost of suit and interest.

67.    In addition, the reprehensibility of Defendants' conduct, in knowingly and maliciously publishing such a defamatory statement and/or its intended implication in wanton and reckless disregard of the harm caused to Plaintiffs gives rise to punitive damages in favor of Plaintiffs and against Defendants in an amount to be determined by the Court.

## AS AND FOR A THIRD CAUSE OF ACTION

## DEFAMATION - LIBEL

68.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 67 of the Complaint with the same force and effect as it fully set forth at length herein.

69.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement that *Baird [Plaintiff] had called him to say how much she appreciated his offer, given how poorly she had performed on prior shows.*

70.    The statement by Defendant Stephen Disson in Paragraph 69 was defamatory because it exposed Plaintiff to public hatred, contempt, ridicule and/or disgrace and discredit and/or injury in Plaintiff's occupation and/or profession.

71.    The statement by Defendant Stephen Disson in Paragraph 69 referred to the Plaintiff.

72.    The statement by Defendant Stephen Disson in Paragraph 69 was published.

73.    The statement by Defendant Stephen Disson in Paragraph 69 was false.

74.    When Defendant Stephen Disson made the statement in Paragraph 69, Defendant Stephen Disson knew that it was false or acted in reckless disregard of the truth or falsity of the statement.

75.    The statement by Defendant Stephen Disson in Paragraph 69 imputes incompetence and/or dishonesty by Plaintiff in Plaintiff's profession and/or is a substantial factor in causing Plaintiffs to suffer financial loss.

76. As an employer, Defendant Disson Skating is vicariously liable for the torts of its President, CEO and employee, Defendant Stephen Disson, committed in the course of his employment.

77. Defendants have caused Plaintiffs to suffer serious, irreparable harm and have caused Plaintiff to be held in public view as incompetent and/or dishonest, and as a direct and proximate result, Plaintiffs have suffered and continue to suffer severe damages, including but not limited to a loss of personal and professional reputation, personal humiliation, mental anguish and/or suffering for Plaintiff, and goodwill, lost earnings and lost potential earnings for Plaintiffs, all in a sum not less than two million ($2,000,000) dollars, attorney's fees, cost of suit and interest.

78. In addition, the reprehensibility of Defendants' conduct, in knowingly and maliciously publishing such a defamatory statement in wanton and reckless disregard of the harm caused to Plaintiffs gives rise to punitive damages in favor of Plaintiffs and against Defendants in an amount to be determined by the Court.

## AS AND FOR A FOURTH CAUSE OF ACTION

## DEFAMATION - LIBEL

79. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 78 of the Complaint with the same force and effect as if fully set forth at length herein.

80.    In the Daily News Article, Defendant Stephen Disson communicated and/or published to a reporter at the New York Daily News and/or to the New York Daily News, both the reporter and the New York Daily News were and are situated in the State of New York, who and/or which then published Defendant Stephen Disson's statement *"[e]ach time she had been a little flaky."* Defendant Stephen Disson in this statement has wrongly labeled the Plaintiff as "flaky".

81.    The statement by Defendant Stephen Disson and/or its labeling of Plaintiff as "flaky" in Paragraph 80 were defamatory because they exposed Plaintiff to public hatred, contempt, ridicule and/or disgrace and discredit and/or injury in Plaintiff's occupation and/or profession.

82.    The statement and/or labeling by Defendant Stephen Disson in Paragraph 80 referred to the Plaintiff.

83.    The statement and/or labeling by Defendant Stephen Disson in Paragraph 80 were published.

84.    The statement and/or labeling by Defendant Stephen Disson in Paragraph 80 were false.

85.    When Defendant Stephen Disson made the statement and/or labeling in Paragraph 80, Defendant Stephen Disson knew that they were false or acted in reckless disregard of the truth or falsity of the statement and/or labeling.

86.     The statement and/or labeling by Defendant Stephen Disson in Paragraph 80 imputes incompetence and/or dishonesty by Plaintiff in Plaintiff's profession and/or is a substantial factor in causing Plaintiffs to suffer financial loss.

87.     As an employer, Defendant Disson Skating is vicariously liable for the torts of its President, CEO and employee, Defendant Stephen Disson, committed in the course of his employment.

88.     Defendants have caused Plaintiffs to suffer serious, irreparable harm and have caused Plaintiff to be held in public view as incompetent and/or dishonest, and as a direct and proximate result, Plaintiffs have suffered and continue to suffer severe damages, including but not limited to a loss of personal and professional reputation, personal humiliation, mental anguish and/or suffering for Plaintiff, and goodwill, lost earnings and lost potential earnings for Plaintiffs, all in a sum not less than two million ($2,000,000) dollars, attorney's fees, cost of suit and interest.

89.     In addition, the reprehensibility of Defendants' conduct, in knowingly and maliciously publishing such a defamatory statement and/or labeling of Plaintiff in wanton and reckless disregard of the harm caused to Plaintiffs gives rise to punitive damages in favor of Plaintiffs and against Defendants in an amount to be determined by the Court.

## AS AND FOR A FIFTH CAUSE OF ACTION

### DEFAMATION - LIBEL