UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

OKSANA S. BAIUL,                                           Civil Action No.:
                                                          13-cv-02205-KBF

                              *Plaintiff*,

     – against –

NBC UNIVERSAL MEDIA, LLC, NBC SPORTS,                      ECF CASE
NETWORK, LP, and DISSON SKATING, LLC,

                              *Defendants*.
--------------------------------------------------------------------X

OKSANA S. BAIUL and OKSANA, LTD,                           Civil Action No.:
                                                          13-cv-02208-KBF

                              *Plaintiffs*,

     – against –

STEPHEN DISSON and DISSON SKATING, LLC,                    ECF CASE

                              *Defendants*.
--------------------------------------------------------------------X

---

**MEMORANDUM OF LAW IN SUPPORT OF THE SUMMARY JUDGMENT
MOTIONS TO DISMISS PLAINTIFFS' CLAIMS IN THE ABOVE-CAPTIONED
ACTIONS FILED BY DEFENDANTS STEPHEN DISSON AND DISSON SKATING,
LLC**

---

**TACOPINA, SEIGEL & TURANO, P.C.**
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
*Attorneys for Stephen Disson and
Disson Skating, LLC*

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Preliminary Statement and Brief Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    NBC Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Disson Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    **Point I** - Most of Plaintiffs' Defamation Claims in the Disson
    Action Are Barred by the Absolute Litigation Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    **Point II** - Many of the Defamation Claims in the Disson Action
    Should Be Dismissed Because the Alleged Statements for
    Those Claims Are an Expression of Opinion or Mere Rhetorical Hyperbole . . . . . . . . . . . 8

    **Point III** - The Alleged Statement That Baiul Once Did Not
    Show Up Because She Was Shopping Is Barred by the Single Instance Rule . . . . . . . . . 10

    **Point IV** - Baiul Is a Public Figure and Has Failed to Prove
    Actual Malice, Thus All of Her Defamation Claims Should Be Dismissed . . . . . . . . . . . 12

    **Point V** - In the NBC Action, Baiul Cannot Prove Causation
    for Her N.Y. Civ. Rights Law § 51 and Federal Lanham Act
    Claims, Thus Those Claims Should Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    **Point VI** - Disson's Emailing of Background Information to
    Baiul's Agent in July 2011 Cannot Be Considered Commercial
    Advertising or Promotion and Could Not Have Caused
    Consumer Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    **Point VII** - Baiul's Section 51 Claim Should Be Dismissed
    Because Disson's Email to Martin Was Mere Incidental
    Use of Baiul's Name and Likeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    **Point VIII** - Baiul Is Not Entitled to Disson Skating's Alleged
    Profits Pursuant to the Lanham Act or Section 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    **Point IX** - Baiul's Lanham Act and Section 51 Claims Should
    Be Dismissed Because She Has Failed to Establish Any
    Damage from Disson's July 12, 2011 Email . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Point X -** Baiul Has No Evidence to Support Her Negligent
Misrepresentation and Fraud Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Point XI -** "Spoliation of Evidence" Is Not a Cause of Action,
Thus Baiul's Fifth Cause of Action in the NBC Case Should
Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F.Supp.2d 305 (S.D.N.Y. 2008)  .  20-21

*Aronson v. Wiersma*, 65 N.Y.2d 592 (1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Batra v. Elec. Land Services, Inc.*, No. 52629/2011, 2013 WL 5607243  . . . . . . . . . . . . . . . . . . . 24
    (Sup. Ct. Westchester Oct. 7, 2013)

*Biro v. Conde Nast*, No. 11 CIV. 4442, 2013 WL 3948394 (S.D.N.Y. Aug. 1, 2013)  . . . . . . . 10, 11

*Boule v. Hutton*, 70 F.Supp 2d 378 (S.D.N.Y. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Depuy v. St. John Fisher Coll.*, 129 A.D.2d 972 (4th Dep't 1987)  . . . . . . . . . . . . . . . . . . . . . 7-8, 12

*Dongguk Univ. v. Yale Univ.*, No. 12-2698-CV, 2013 WL 4106644 (2d Cir. Aug. 15, 2013)  . . . . 11

*Dor Yeshurim, Inc. v. A Torah Infertility Medium of Exch.*, No. CV 10-2837, . . . . . . . . . . . . . . . 20
    2011 WL 7285038 (E.D.N.Y. Aug. 10, 2011)

*Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435 (1960)  . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fishof v. Abady*, 280 A.D.2d 417 (1st Dep't 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F2d 1532, 1540 (2d Cir. 1992)  . . . . . . . . . . . . . 19

*Howard v. Alford*, 229 A.D.2d 996 (4th Dep't 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL 35928688  . . . . . . . . . . . . . . . . . . . . . 4
    (Sup. Ct. N.Y. Co. Dec. 18, 2000)

*Hussey v. New York State Dept. of Law/Off. of Atty. Gen.*, 933 F.Supp.2d 399 (E.D.N.Y. 2013) . . . 9

*Kolchinsky v. Moody's Corp.*, No. , 2012 WL 639162 (S.D.N.Y. Feb. 28, 2012)  . . . . . . . . . . . . . 10

*Lamb v. Money Transfer Sys., Inc.*, No. 12-CV-6584, 2013 WL 5216442  . . . . . . . . . . . . . . . . . . . 24
    (W.D.N.Y. Sept. 16, 2013)

*Landis v. Remington Arms Co., Inc.*, No. 8:11-CV-1377, 2012 WL 6098269  . . . . . . . . . . . . . . . . 25
    (N.D.N.Y. Dec. 7, 2012)

*Larson v. Albany Med. Ctr.*, 252 A.D.2d 936 (3d Dep't 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lipin v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F.Supp.2d 126 (S.D.N.Y. 2002)  . . . . . . . 4

*Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447 (5th Cir. 2001) . . . . . . . . . . . . 19

*Marshall v. Marshall*, No. 08 CV 1420 LB, 2012 WL 1079550 (E.D.N.Y. Mar. 30, 2012), . . . . . 20
    *aff'd*, 504 Fed.Appx. 20 (2d Cir. 2012)

*Merck Eprova AG v. Brookstone Pharm.*, LLC, 920 F.Supp.2d 404 (S.D.N.Y. 2013) . . . . . . . . . . 19

*Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301 (1st Dep't 1995) . . . . . . . . . . . . . . . . . . 4

*Naked Cowboy v. CBS*, 844 F.Supp.2d 510 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*Netzer v. Continuity Graphic Assoc., Inc.*, 963 F.Supp 1308 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . 18

*Penn Warranty Corp. v. DiGiovanni*, 10 Misc 3d 998 (Sup. Ct. N.Y. Co. 2005) . . . . . . . . . . . . . . 7

*Ram v. Moritt*, 205 A.D.2d 516 (2d Dept 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rappaport v. Buske*, No. 98 CIV. 5255, 2000 WL 1224828 (S.D.N.Y. Aug. 29, 2000) . . . . . . . . 18

*Rosenthal v. Roberts*, No. 102603/04, 2005 WL 3334272 (Sup. Ct. N.Y. Co. Oct. 11, 2005) . . . . . 7

*Sellify Inc. v. Amazon.com, Inc.*, No. 09 CIV 10268 JSR, 2010 WL 4455830 . . . . . . . . . . . . . . . . 20
    (S.D.N.Y. Nov. 4, 2010)

*Stroup v. Nazzaro*, 91 A.D.3d 1367 (4th Dep't 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Univ. of Notre Dame Du Lac v. Twentieth Century-Fox Film Corp.*, 22 A.D.2d 452 . . . . . . . . . . 18
    (1st Dep't 1965), *aff'd*, 15 NY2d 940 (1965)

*Walter v. NBC Tel. Network, Inc.*, 27 A.D.3d 1069 (4th Dep't 2006) . . . . . . . . . . . . . . . . . . . . . . . 12

**Other Authorities:**

Lanham Act §1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13, 14, 16, 17, 20, 21, 23

Local Civil Rule 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.Y. Civil Rights Law § 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 12, 13, 14, 18, 20, 21, 23

## INTRODUCTION

Defendants Stephen Disson ("Disson") and Disson Skating LLC ("Disson Skating") respectfully submit this Memorandum of Law in support of their motions for summary judgment in the actions *Baiul v. NBC Universal Media, LLC*, No. 13-cv-02205-KBF ("NBC Action") and *Baiul v. Disson*, No. 13-cv-02208-KBF ("Disson Action"), seeking the dismissal of all of Plaintiffs' claims in both actions against them with prejudice, with such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT AND BRIEF STATEMENT OF THE FACTS[1]

### NBC Action

In the NBC Action, Baiul – the famous female figure skater who won gold in the 1994 Olympics – sued Disson Skating for alleged improper use of her name and likeness and asserts claims under the Lanham Act and N.Y. Civil Rights Law § 51. She alleges that Disson Skating improperly used her name and likeness in background material for two professional skating shows that were produced by *non-party* Disson Skating, LLC of Pennsylvania ("Disson PA") – a separate company from Disson Skating (a Virginia entity) – during a time *after* Baiul agreed through her agent, Steve Martin ("Martin"), to appear in these shows and *before* she decided to back out of these shows. The two skating shows at issue are the Improv-Ice show in December 2011 in Greenville, S.C. ("Improv-Ice Show") and the Skating Romance Show in Kent, WA. in January 2012 ("Romance Show"; collectively the "Disson Shows"). Her claims lack merit and should be dismissed for three simple reasons.

**First**, to the extent that any entity improperly used Baiul's name and likeness, it was simply not Disson Skating because the alleged use occurred prior to Disson Skating even coming into existence. Thus, Baiul has simply sued the wrong entity and has known this for months. **Second**, of the five alleged materials that used her name and likeness, *non-party* Disson PA only caused one of them, which was

---

[1]      For a full recitation of the facts relevant to these motions, Defendants respectfully refer the Court to their accompanying Local Civil Rule 56.1 Statement ("D.56.1").

1

merely a background document that Disson emailed to Martin when they were discussing Baiul's deal to perform in the Disson Shows. **Third**, this single document was never sent to any consumer, it caused no consumer confusion, it did not cause any damage whatsoever to Baiul, and it in no way affected the profits (or lack thereof) of the Disson Shows.

Thus, as a matter of law, Baiul has no viable claim pursuant to the Lanham Act or N.Y. Civil Rights Law § 51.

**Disson Action**

After Baiul filed the NBC Action, reporters from the New York Daily News ("Daily News") and the New York Post ("Post") contacted Disson for a response to Baiul's well-publicized lawsuit. Essentially, Disson told them that Baiul's suit was bogus because Baiul agreed to be in the Disson Shows, then backed out of the shows, and he never publicly announced that Baiul would be in the Disson Shows or used her name or likeness in any promotional or advertising material for these events. Thus, the alleged defamatory comments attributed to Disson in these two newspapers, which set forth Disson's position as to Baiul's lawsuit, are absolutely privileged under New York law and simply cannot serve as a basis for a defamation claim. However, Baiul and her counsel somehow thought otherwise and filed a multi-million dollar lawsuit against Disson and Disson Skating for alleged defamation of character.

This suit also alleges that Disson defamed Baiul through statements attributed to him by the Daily News, which Disson denies making, that Baiul was "flaky," her lawsuit was "weird," Baiul previously performed "poorly," and that she once did not show up for work. One can only imagine how the reputation of a world-renown figure skater who won an Olympic gold medal could actually be damaged by such stray comments, which Disson denies making, in a single article in a single newspaper. Regardless, even if Disson did make these comments, they are protected opinion or rhetorical hyperbole, both of which cannot serve as a basis for valid defamation claim.

Furthermore, Baiul has zero evidence – except for outlandish speculation based upon a two-page

2

chart with admittedly "random" numbers – that she was in anyway damaged by any of the comments attributed to Disson.   For instance, Baiul's two-page damages chart, which is largely based upon documents that Baiul never produced in discovery, claims that before Disson's alleged comments, Baiul's "Average Per Year" income was $1,539,428 and Disson purportedly is responsible for $115,000 of lost income going forward.   These numbers are incredible and shocking, because Baiul's tax returns, or at least the ones that she produced in these actions, clearly state that her *total* gross income for years 2008 through 2011 *combined* was only $45,972.

* * *

Accordingly, based upon the forgoing, and for the reasons set forth below, all of Baiul's claims in these two actions lack merit and should be dismissed with prejudice.

<b>ARGUMENT</b>

<b>POINT I</b>

<b>MOST OF PLAINTIFFS' DEFAMATION CLAIMS IN THE DISSON ACTION<br/>ARE BARRED BY THE ABSOLUTE LITIGATION PRIVILEGE</b>

"Section 74 of the Civil Rights Law prohibits a civil action that alleges injury from the publication of a fair and true report of any judicial proceeding. The absolute privilege under that statute also extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation." *Fishof v. Abady*, 280 A.D.2d 417, 417 (1st Dep't 2001) (internal citations and quotations omitted).

As held by Judge Swain of this District:

Under New York law, "in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view, or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander*, 898 F.Supp. 162, 171 (S.D.N.Y.1995). The concept of pertinent material is "extremely broad" and "embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Id.* All that is required for a statement to be privileged is a minimal possibility of pertinence. *See Seltzer v. Fields*, 20 A.D.2d 60, 244 N.Y.S.2d 792, 795–96 (1st Dep't 1963), *aff'd*, 14 N.Y.2d 624,

3

249 N.Y.S.2d 174, 198 N.E.2d 368 (1964). The rule rests upon the notion that parties "should be able to 'speak with the free and open mind which the administration of justice demands' without the constant fear of libel suits." *Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381, 683 N.Y.S.2d 88, 89 (1st Dep't 1999) (citation omitted).

*Lipin v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F.Supp.2d 126, 137-38 (S.D.N.Y. 2002).

Additionally, if the statement is "a substantially accurate description of [a party's] position in ... [a] proceeding [it is] privileged under New York Civil Rights Law § 74." *Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 310 (1st Dep't 1995); *see also Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL 35928688 (Sup. Ct. N.Y. Co. Dec. 18, 2000) ("The statement to the New York Times was a substantially accurate description of defendant's position in the action commenced by plaintiff and thus was privileged under New York Civil Rights Law Section 74.").

Here, in the Disson Action, Plaintiffs' defamation claims arise from alleged statements of Disson published in the Daily News on February 4, 2013 ("Daily News Article") and the Post on February 5, 2013 ("Post Article"). *See* D.56.1 at ¶ 115; Ex. A[2] at ¶¶ 10, 29 and *passim*; Exs. 6 and 12 to Ex. A.  The Daily News Article and Post Article were about Baiul suing NBC and Disson Skating in the NBC Action for allegedly using Baiul's name and likeness in promotional and advertising materials without her permission. *See* D.56.1 at ¶ 116; Exs. 6 and 12 to Ex. A.  The alleged statements of Disson in these two articles were published to set forth Disson's alleged response to and position as to this lawsuit. *See* D.56.1 at ¶ 117; Exs. 6 and 12 to Ex. A.

Specifically, Plaintiffs' First and Ninth Causes of Action in the Disson Action are based upon Disson's alleged statement to the Daily News that: "his company never publically disclosed his negotiations to have Baiul [Plaintiff] appear." *Id.* at ¶ 119; Ex. A at ¶¶ 47 and 135. This statement is consistent with Disson Skating's position in the NBC Action, which Disson made clear in his deposition.

---

[2]        Unless otherwise stated, all exhibit references herein refer to the exhibits attached to the accompanying Declaration of Matthew G. DeOreo ("DeOreo Dec.").

Disson testified that (a) neither Disson nor *non-party* Disson PA ever publicly disclosed his "negotiations" with Baiul, *see* Ex. C at 233:16 to 239:13; and (b) "negotiations" between *non-party* Disson PA and Baiul constituted his July 2011 communications with Martin, *see id.* at 237:21 to 238:4.

Plaintiffs' Second and Tenth Causes of Action in the Disson Action are based upon Disson's alleged statement to the Daily News that: "[i]t's just weird." *See* D.56.1 at ¶ 124; Ex. A at ¶¶ 58 and 146. While Disson denies that he made this statement (*see* D.56.1 at ¶ 125; Ex. C at 239:22 to 240:21), labeling a lawsuit as "weird" can be interpreted as conveying that the lawsuit has no factual basis. Thus, this statement is consistent with Disson Skating's position – as he described in his deposition – that (a) Disson and *non-party* Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed to do the Disson Shows (*see* Ex. C at 58:5-15, 68:3 to 70:2; 70:11-13; 70:16 to 71:13; 74:25 to 76:3; 77:9 to 78:19; and 87:18-21; 172:4-11; 173:4 to 174:3; 179:22 to 180:17); and (c) Baiul then backed out of these events (*see* Ex. C at 146:15 to 147:12; 148:2-6; 256:23 to 257:2).

Plaintiffs' Third and Eleventh Causes of Action in the Disson Action are based upon Disson's alleged statement to the Daily News that: "Baiul [Plaintiff] had called him to say how much she appreciated his offer, given how poorly she had performed on prior shows." *See* D.56.1 at ¶ 128; Ex. A at ¶¶ 60 and 157. While Disson denies that he made the second part of this statement that she previously performed poorly (*see* D.56.1 at ¶ 129; Ex. C at 240:22 to 242:2), this statement can be read to convey that Baiul appreciated Disson's offer to perform in the Disson Shows. As described by Disson in his deposition, that statement is consistent with Disson Skating's position in the NBC Action because Baiul's appreciation is further evidence that she agreed to perform in the Disson Shows. *See* Ex. C at 241:16-17; 242:13-17.

Plaintiffs' Sixth and Fourteenth Causes of Action in the Disson Action are based upon Disson's alleged statement to the New York Daily News that: "[s]he was grateful for a third chance ...." *See* D.56.1 at ¶ 145; Ex. A at ¶¶ 102 and 190. While Disson denies that he made this statement (*see* D.56.1 at ¶ 146;

5

Ex. C at 245:16 to 246:7), this statement can also be read to convey that Baiul appreciated Disson's offer to perform in the Disson Shows. As noted above, such a statement is consistent with Disson Skating's position in the NBC Action because Baiul's appreciation supports the argument that she agreed to perform in the Disson Shows.

Plaintiffs' Seventh and Fifteenth Causes of Action are based upon Disson's alleged statement to the New York Post that: "she [Plaintiff] approached him through an agent in mid-2011 and asked to be included in the shows then backed out within weeks after he agreed – well before he started ads for them." *See* D.56.1 at ¶ 150; Ex. A at ¶¶ 113 and 201. While Disson denies that he made this statement (*see* D.56.1 at ¶ 151; Ex. C at 247:7-18), this statement is consistent with Disson Skating's position in the NBC Action that (a) Disson and *non-party* Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed, through her agent – Martin, to perform in the Disson Shows (*see* Ex. C at 58:5-15, 68:3 to 70:2; 70:11-13; 70:16 to 71:13; 74:25 to 76:3; 77:9 to 78:19; and 87:18-21; 172:4-11; 173:4 to 174:3; 179:22 to 180:17); and (c) Baiul then backed out of these shows (*see* Ex. C at 146:15 to 147:12; 148:2-6; 256:23 to 257:2).

Plaintiffs' Eighth and Sixteenth Causes of Action are based upon Disson's alleged statement to the New York Post that: "[w]e never announced Oksana [Plaintiff] in either show or featured her in any of our advertising or promotional materials." *See* D.56.1 at ¶ 158; Ex. A at ¶¶ 124 and 212. This statement is consistent with Disson Skating's position in the NBC Action that *non-party* Disson PA never announced that Baiul was in the Disson Shows or named Baiul in any advertising or promotional materials for these shows. *See* Ex. C at 251:5 to 252:12; 255:6-19; *see also id.* at 144:20 to 145:24; 147:17 to 148:6; 236:14-24; 238:14 to 239:3.

Accordingly, all of the above alleged defamatory statements are a substantially accurate description of Disson Skating's position in the NBC Action and are thus absolutely privileged. Hence, in the Disson Action, the Court should dismiss Plaintiffs' (a) First and Ninth Causes of Action; (b)

6

Second and Tenth Causes of Action; (c) Third and Eleventh Causes of Action; (d) Sixth and Fourteenth

Causes of Action; (e) Seventh and Fifteenth Causes of Action; and (f) Eighth and Sixteenth Causes of

Action.

## POINT II

### MANY OF THE DEFAMATION CLAIMS IN THE DISSON ACTION SHOULD BE DISMISSED BECAUSE THE ALLEGED STATEMENTS FOR THOSE CLAIMS ARE AN EXPRESSION OF OPINION OR MERE RHETORICAL HYPERBOLE

A defamation claim should be dismissed if it arises from a statement of opinion. *See Howard v.*

*Alford*, 229 A.D.2d 996, 997 (4th Dep't 1996) ("[B]ecause the statement was an expression of defendant

Alford's opinion of plaintiff's efforts as an employee of AM & A, it is constitutionally protected (*see,*

*Miller v. Richman*, 184 A.D.2d 191, 193, 592 N.Y.S.2d 201; *Williams v. Varig Brazilian Airlines*, 169

A.D.2d 434, 438, 564 N.Y.S.2d 328, lv. denied 78 N.Y.2d 854, 573 N.Y.S.2d 467, 577 N.E.2d 1059).");

*Rosenthal v. Roberts*, No. 102603/04, 2005 WL 3334272, * 1 (Sup. Ct. N.Y. Co. Oct. 11, 2005) ("The

court shall grant defendants' motion to dismiss this defamation action because the statements alleged to

be defamatory constitute protected opinion in the context of a highly charged union election."); *Penn*

*Warranty Corp. v. DiGiovanni*, 10 Misc 3d 998, 1005 (Sup. Ct. N.Y. Co. 2005) ("Perhaps most

compelling however, is the fact that the web site, when viewed in its full context, reveals that defendant

is a disgruntled consumer and that his statements reflect his personal opinion based upon his personal

dealing with plaintiff. They are subjective expressions of consumer dissatisfaction with plaintiff and the

statements are not actionable because they are defendant's personal opinion.").

Furthermore, a statement that is a mere rhetorical hyperbole is not actionable. *See Stroup v.*

*Nazzaro*, 91 A.D.3d 1367, 1368 (4th Dep't 2012) ("Defendant's statement that plaintiff was an 'abuser,'

viewed in the context of the heated incident on the bus, amounted to no more than name-calling or a

general insult, a type of epithet not to be taken literally and not deemed injurious to reputation."); *Depuy*

*v. St. John Fisher Coll.*, 129 A.D.2d 972, 972 (4th Dep't 1987) ("[R]eference to plaintiff as a 'clown'

amounted to no more than name-calling or a general insult, a type of epithet not to be taken literally and not deemed injurious to reputation. A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more. We conclude that in the context in which the statement was made, it was not susceptible of a defamatory meaning and was not actionable.")(citations and quotations omitted); *Ram v. Moritt*, 205 A.D.2d 516 (2d Dept 1994) ("The plaintiff charges that the associate called the plaintiff a "liar", a "cheat", and a "debtor" in the presence of patients in the doctor's waiting room. Our review of the statements convinces us that they were not reasonably susceptible of a defamatory meaning, but rather constituted personal opinion and rhetorical hyperbole rather than objective fact, and thus were constitutionally protected.").

Additionally, a general criticism of a plaintiff's professional performance is not actionable. *See Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) ("The mere expression of unhappiness with plaintiff's fulfilling her duties as a legislative assistant is not libelous per se."); *Howard*, 229 A.D.2d at 997 (holding same). (*See* discussion *supra* at POINT III for a discussion as to Baiul's lack of special damages.)

Here, in the Disson Action, Plaintiffs allege defamation claims based upon alleged statements that Baiul's NBC Action is "weird," Baiul was a "little flaky," Baiul "was grateful for a third chance," and Baiul previously performed "poorly." Even though Disson denies that he made these statements (*see* D.56.1 at ¶¶ 125, 129 and 132), such alleged statements would constitute mere opinion, rhetorical hyperbole and/or a general criticism of Baiul's professional performance. Therefore, in the Disson Action, the Court should dismiss Plaintiffs' (a) Second and Tenth Causes of Action; (b) Third and Eleventh Causes of Action; (c) Fourth and Twelfth Causes of Action; and (d) Sixth and Fourteenth Causes of Action.

## POINT III

## THE ALLEGED STATEMENT THAT BAIUL ONCE DID NOT SHOW UP BECAUSE SHE WAS SHOPPING IS BARRED BY THE SINGLE INSTANCE RULE

An alleged defamatory statement that accuses plaintiff of a single dereliction of plaintiff's professional duties is not actionable without proof of special damages:

> Defendant Rogers' statement that plaintiff 'fucked up the case' is one that would tend to disparage or injure her in her profession. However, it falls within the purview of New York's "single instance rule"—a narrow exception to this category of defamation per se—and thus is not actionable absent a showing of special damages. The "single instance rule" applies where a defamatory statement accuses plaintiff of a single dereliction in connection with his profession. A statement identifying a single professional error in judgment does not amount to an accusation of general incompetence, ignorance or lack of skill and is therefore not deemed actionable unless special damages are pleaded and proven. This rule is in place because New York recognizes the human tendency to err, and that, therefore, to state that a professional person has erred in a particular instance would not presumptively cause damage to that person in his business or profession, because such statement would imply no more than that the person was human.

*Hussey v. New York State Dept. of Law/Off. of Atty. Gen.*, 933 F.Supp.2d 399, 415 (E.D.N.Y. 2013) (internal quotations, citations, brackets and ellipses omitted); *see also Larson v. Albany Med. Ctr.*, 252 A.D.2d 936, 939 (3d Dep't 1998) ("The statements involved alleging that plaintiffs were insubordinate or engaged in unprofessional conduct are subject to the single instance exception because such charges did not suggest that plaintiffs were incompetent as nurses.").

Additionally, a plaintiff fails to prove special damages when plaintiff "fail[s] to itemize" his/her damages as to the alleged defamatory statement, because such is "deemed a representation of general damages and these are legally insufficient." *See Larson*, 252 A.D.2d at 939; *see also Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 441 (1960) ("The damage claimed is $5,000,000. Such round figures, with no attempt at itemization, must be deemed to be a representation of general damages. It is an established rule in New York that a libel on the product is actionable by the manufacturer only if special damages are alleged ....") (citations omitted).

Here, Plaintiffs' Fifth and Thirteenth Causes of Action in the Disson Action are based upon Disson's alleged statement to the New York Daily News that: "One time, she didn't show up. She was out shopping ...." *See* D.56.1 at ¶ 136; Ex. A at ¶¶ 91 and 179. While Disson denies making this statement, not showing up for work one time is an accusation of a single dereliction in connection with Baiul's profession, and is thus covered by the "single instance rule."

Furthermore, Baiul has failed to establish special damages for this claim, because she fails to prove damages specific to this alleged defamatory statement. *See* D.56.1 at ¶¶ 163-166; Ex. LL at BAIUL 723-724 and 733 to 734; Ex. J at 262:9 to 266:20; Ex. G at 386:7 to 389:3; 395:7 to 398:22.

Therefore, the Court should dismiss Plaintiffs' Fifth and Thirteenth Causes of Action in the Disson Action.

## POINT IV

### BAIUL IS A PUBLIC FIGURE AND HAS FAILED TO PROVE ACTUAL MALICE, THUS ALL OF HER DEFAMATION CLAIMS SHOULD BE DISMISSED

"'Whether or not a person ... is a public figure is a question of law for the court to decide.' *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.Supp. 661, 666 n. 3 (S.D.N.Y.1991)." *Biro v. Conde Nast*, No. 11 CIV. 4442, 2013 WL 3948394, * 11 (S.D.N.Y. Aug. 1, 2013) (Oetken, J.). If plaintiff is a public figure, he/she must establish actual malice in order to have a viable defamation claim. *See Kolchinsky v. Moody's Corp.*, No. , 2012 WL 639162, * 4 (S.D.N.Y. Feb. 28, 2012) (Crotty, J.) ("Where the plaintiff is a public figure, a complaint must allege that the defendant made the defamatory statement with actual malice."). A Court "evaluate[s] whether a party is a public figure based on clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Dongguk Univ. v. Yale Univ.*, No. 12-2698-CV, 2013 WL 4106644, *7 (2d Cir. Aug. 15, 2013).

"Actual malice" must be proven by clear and convincing evidence. *See Biro*, 2013 WL 3948394, * 16. "Actual malice" means a "deliberate or reckless falsification," and recklessness must be established by evidence that "the defendant in fact entertained serious doubts as to the truth of his publication." *Id.*

Here, it cannot be credibly disputed that Baiul is a public figure. She is a world-famous figure skater who won the 1993 World Championship, Ladies Figure Skating, at the age of 15 years old and became the 1994 Olympic Gold Medalist, in Ladies Figure Skating. *See* D.56.1 at ¶ 1; Ex. A at ¶ 2. Baiul also considers herself the "queen of the ice," a "superstar" and a "global entertainer." *See* D.56.1 at ¶ 114; Ex. A at ¶ 2; Ex. G at 382: 7-8; 424: 11-21.

Thus, for all of the alleged defamatory statements, Baiul must prove that Disson knew the statement he was making was false or entertained serious doubts as to the truth of his statements. In her deposition, Baiul admitted that she has no evidence as to the subjective intent or knowledge of Disson with regard to any of the alleged statements for her defamation claims. *See* D.56.1 at ¶¶ 118, 122-123, 126-127, 130, 133-134, 138-139, 147, 149, 152-153, and 161-162.

Specifically, as to the defamation claims concerning whether *non-party* Disson PA publicly announced, promoted or advertised that Baiul was going to be in the Disson Shows (1st, 7th, 8th, 9th, 15th, and 16th Causes of Action), Disson believes, with good reasons, that (a) Disson and *non-party* Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed to do the Disson Shows (*see* Ex. C at 58:5-15, 68:3 to 70:2; 70:11-13; 70:16 to 71:13; 74:25 to 76:3; 77:9 to 78:19; and 87:18-21; 172:4-11; 173:4 to 174:3; 179:22 to 180:17); and (c) Baiul then backed out of these shows (*see* Ex. C at 146:15 to 147:12; 148:2-6; 256:23 to 257:2).

As to the alleged statement "[o]ne time, she didn't show up. She was shopping ..." (5th at 13th Causes of Action), which Disson denies making, Disson had prior, personal knowledge of Baiul not showing up on time for a dress rehearsal because she was shopping – facts that he personally witnessed. *See* D.56.1 at ¶¶ 140-141; Ex. C at 203:5-11; 224:7-13; 224: 16-21; and 224:24 to 225: 5; and 244:23 to

11

245:6.  In fact, Baiul admits that (a)  her former agent, David Baden of IMG, heard the same facts with

regard to her not showing up for a rehearsal as described by Disson, *see* D.56.1 at ¶ 142 and Ex. G at

340:5-20; and (b) prior to 2011, it was gossip in the skating business that Baiul missed an event because

she was out shopping,   *see* D.56.1 at ¶ 143 and Ex. G at 341:10 to 343:4.

With regard to the alleged statements of  "weird," a "little flaky," "grateful for a third chance,"

and performing "poorly" (2nd, 3rd, 4th, 6th, 10th, 11th, 12th, and 14th Causes of Action), such terms clearly

have ambiguous and subjective meanings. These statements are rhetorical hyperbole, and as such, are "not

to be taken literally." *Stroup*, 91 A.D.3d at 1368; *Depuy*, 129 A.D.2d at 973.  Hence, there is simply no

way that Baiul could prove, by clear and convincing evidence, the subjective intent of the person making

such statements.

Accordingly, Baiul has failed to prove actual malice for any of the alleged defamatory statements

and her Amended Complaint in the Disson Action should be dismissed with prejudice.

## POINT V

### IN THE NBC ACTION, BAIUL CANNOT PROVE CAUSATION FOR HER N.Y. CIV.  RIGHTS LAW § 51 AND FEDERAL LANHAM ACT CLAIMS, THUS THOSE CLAIMS SHOULD BE DISMISSED

In order to establish a N.Y. Civil Rights Law § 51 claim, a plaintiff must establish "nonconsensual

commercial appropriations of the name, portrait or picture of a living person." *Walter v. NBC Tel.*

*Network, Inc.*, 27 A.D.3d 1069, 1070 (4th Dep't 2006).  In order to establish a false endorsement claim

under the Lanham Act, Section 1125(a), a plaintiff must establish that "Defendants, (1) in commerce, (2)

made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely

to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Naked*

*Cowboy v. CBS*, 844 F.Supp.2d 510, 516 (S.D.N.Y. 2012) (Jones, D.J.).

In the NBC Action, Baiul's N.Y. Civil Rights Law § 51 and Federal Lanham Action claims (First and Second Causes of Action) are based upon five alleged instances of *non-party* Disson PA purportedly using her name and likeness:

A.    The July 13, 2011 5 page marketing and advertising promotional packet for the [Romance Show],

B.    The Fall of 2011 Magic 98.9 radio station advertising for the [Improv-Ice Show],

C.    The Fall of 2011 ROCK 101 radio station advertising for the [Improv-Ice Show],

D.    The February 2, 2012 press release for the [Romance Show] was posted by Defendant NBC on its wholly-owned NBC Media website with unlimited access granted worldwide, and

E.    The February 2, 2012 The Entertainment Hotline posting of the Defendants' February 2, 2012 press release for the [Romance Show].

(Ex. D at ¶ 21).[3]

**Disson Skating Did Not Exist at the Time of the Alleged Statutory Violations**

In the first instance, all of these alleged uses of Baiul's name and likeness occurred prior to March 2012, including the "July 13, 2011 5 page marketing and advertising promotional packet for the [Romance Show]," and Disson Skating did not exist until March 2012. *See* D.56.1 at ¶¶ 5-7; Ex. B; Ex. C at 187:18 to 188:13;  Disson Decl. at ¶ 4.  Therefore, it was simply impossible for Disson Skating to have used Baiul's name or likeness prior to March 2012, and Baiul's Section 51 and Lanham Act claims against it must be dismissed for that reason alone.

---

[3]    While Baiul attempted to add other instances of alleged use of her name and likeness by way of an Amended Complaint (Ex. NN), leave to amend was denied by the Court (Ex. OO). Thus, the only remaining instances of alleged use of Baiul's name and likeness to be tried are those set forth in the Complaint.

**No Disson Company Caused the Radio Station Advertisements**

As to the radio station advertisements ("The Fall of 2011 Magic 98.9 radio station advertising for the [Improv-Ice Show]" and "The Fall of 2011 ROCK 101 radio station advertising for the [Improv-Ice Show]" [Ex. D at ¶ 21(B-C)]), no Disson company was in anyway responsible for or caused these advertisements. *See* D.56.1 at ¶¶ 54-59;  Ex. C at 148:7 to 150:9; 204:24 to 205:9.

Indeed, Baiul admits that her sole "evidence" that a Disson company  was involved with these ads is that a Disson company purportedly paid for these ads and that a Disson company was the producer of the show. *See* Ex. G at 146:21 to 149:9. However, the venue that hosted the show, not a Disson company, paid for the advertising for this show. *See* Ex. C at 255:6-19; 258:13-20; 260:2-6;  Disson Decl. at ¶ 5.

In fact, Disson did not even know about these ads until Baiul filed her lawsuit. *See* Ex. C at 259:7 to 260:6. Moreover, all of the ads that were issued by the venue were approved by *non-party* Disson PA, and none of them named Baiul. *See id.* at 148:7 to 150:9; 204:24 to 205:9; 259:7 to 260:6. Copies of all of the print and internet advertising for the Improv-Ice Show are attached to the Disson Decl. as Ex. 1, none of which mention Baiul. *See* D.56.1 at ¶ 107; Disson Decl. at ¶ 7.

**No Disson Company Caused the NBC Press Release**

As to the NBC press release (Ex. D at ¶ 21(D)), no Disson company was involved with or caused the issuance of this press release. *See* D.56.1 at ¶¶ 60-69.

By way of background, on February 2, 2012, NBC issued a press release which listed Baiul as a performer for the Romance Show, which was televised two days later, on February 4, 2012. *See* Ex. V. However, Disson never saw this press release before it was posted. *See* Ex. C at 150:10 to 156:5. According to Jonathan Miller ("Miller"), the President of Programming for NBC Sports Group (Ex. W at 7:21 to 8:2), the press release was posted on a NBC website and no Disson company had any involvement in the issuance of this press release. *See* Ex. W at106:16 to 107:25.

14

Furthermore, Miller also testified that Justine DeMaio ("DeMaio"), a public relations employee for NBC's Public Relations department, oversaw the issuance of this press release. *See id.* at 108:2-21. It is undisputed that Lynn Plage, an independent contractor and publicist for *non-party* Disson PA, emailed DeMaio on January 31, 2012 – *prior* to the issuance of the February 2, 2012 press release – a Tune-In Alert for the Romance Show that listed all of the skaters for that show, which did not include Baiul. *See* Ex. C at 150:15 to 151:14; 184:6-13; Ex. X. Miller testified that he has no doubt that DeMaio received this email and Tune-In Alert. *See* Ex. W at 108:22 to 112:14.

Additionally, Gillian Lusins ("Lusins"), in-house counsel for NBC, sent Baiul's prior counsel a letter on May 25, 2012 stating that NBC's issuance of this press release with Baiul's name was an "unfortunate error" and that it "mistakenly referred to a outdated list of participants ...." Ex. Y. Baiul admits that her only "evidence" that a Disson company caused the press release is Lusins's May 25, 2012 letter. *See* Ex. G at 149:10 to 150:23. However, as demonstrated above, Lusins's letter admits that the NBC press release was an error of NBC because it did not rely upon the current list of skaters for the Romance Show, not an error of any Disson company. *See* Ex. Y.

Therefore, based upon the foregoing, it is clear that no Disson company caused or was involved in the issuance of the NBC press release.

**No Disson Company Caused the Entertainment Hotline Posting**

As to the Entertainment Hotline posting (Ex. D at ¶ 21(E)), no Disson company was involved with or caused its issuance. *See* D.56.1 at ¶¶ 70-75. By way of background, on February 2, 2012, a website, theentertainmenthotline.net, re-posted the NBC press release on its website. *See* Ex. Z. In fact, a comparison of the NBC press release (Ex. V) and The Entertainment Hotline posting (Ex. Z) makes clear that the exact same text is in both, and thus, The Entertainment Hotline posting merely cut and pasted the NBC press release.

Thus, because no Disson company had any involvement with the NBC press release, no Disson company could have been involved in The Entertainment Hotline posting. *See* discussion *supra; see also* Disson Decl. at ¶ 9. Furthermore, Disson only learned of it after Baiul commenced litigation in 2013. *See* Disson Decl. at ¶ 9. Additionally, Disson testified that any advertisements for the Disson Shows were handled by the venues for the Disson Shows and none of those advertisement included Baiul's name. *See* Ex. C at 148:7 to 150:9; 204:24 to 205:9; 259:7 to 260:6.

Lastly, Baiul admits that she has no evidence that a Disson company was involved in The Entertainment Hotline posting and she only "assumed" one was involved. *See* Ex. G at 151:10 to 152:6. Therefore, based upon the foregoing, it is clear that no Disson company caused or was involved in the issuance of the NBC press release.

* * *

Accordingly, any Section 51 or Lanham Act claim against Disson Skating based upon the radio station advertisements, the NBC Press Release, and The Entertainment Hotline posting must be dismissed for lack of causation. Furthermore, *non-party* Disson PA, **not** Disson Skating, allegedly caused the July 13, 2011 use of Baiul's name and likeness. Hence, any such claim based upon that use must similarly be dismissed.

## POINT VI

### DISSON'S EMAILING OF BACKGROUND INFORMATION TO BAIUL'S AGENT IN JULY 2011 CANNOT BE CONSIDERED COMMERCIAL ADVERTISING OR PROMOTION AND COULD NOT HAVE CAUSED CONSUMER CONFUSION

As noted above, in order for Baiul to have a valid false endorsement claim under Section 1125(a) of the Lanham Act, she must prove that the alleged use of her name and likeness in commercial advertising or promotion "likely ... cause[d] consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Naked Cowboy*, 844 F.Supp.2d at 516. Here, the only alleged use of Baiul's name and likeness by a Disson entity was when Disson emailed Baiul's agent, Martin, an informational

16

packet that contained Baiul's name and likeness.

By way of background, on July 12, 2011, Disson emailed Martin a written offer for Baiul to perform in the Disson Shows. *See* Ex. L. Attached to that email were two attachments. *See id.* at p. 2. Thereafter, on July 13, 2011, Martin forwarded the July 12, 2011 email to Baiul with the two attachments. *Id.*

Baiul testified that the basis for the alleged July 13, 2011 use of her name and likeness was this email chain (Ex. L). *See* Ex. G at 61:9 to 65:15. Martin testified that he does not remember even opening the attachments to that email. *See* Ex. E at 30:22 to 31:4. According to Plaintiffs' Amended Complaint in the Disson Action, Ex. 8 thereto is the document that Disson emailed Martin on July 12, 2011 (Martin forwarded this email to Baiul on July 13, 2011) and serves as the basis for Baiul's allegation in her Complaint in the NBC Action that a Disson company used her name and likeness on July 13, 2011. *See* Ex. A at ¶ 12 and Ex. 8 thereto; Ex. D at ¶ 21(A).

Thus, Baiul's sole evidence of a Disson company using her name and likeness on July 13, 2011 is that Disson – on behalf of *non-party* Disson PA – emailed Martin, her agent and at the very least her "potential agent" (Ex. D at ¶ 8), a document with her name and likeness. *See* Ex. G at 61:9 to 65:15. Importantly, Baiul admits that she has no evidence that this document was sent to anyone besides her and Martin. *See* Ex. G at 141:4-9; 143:4-14.

Therefore, the July 12, 2011 email and attachment never reached any consumers, and in turn, there simply could be no consumer confusion or use in commercial advertising or promotion. *See Boule v. Hutton*, 70 F.Supp 2d 378, 389 (S.D.N.Y. 1999) (Cedarbaum, D.J.) ("[T]hree isolated statements cannot be considered 'commercial advertising or promotion' within the meaning of the Lanham Act.").

Based upon the foregoing, Baiul has no evidence to establish a false endorsement claim under Section 1125(a) of the Lanham Act and it should be dismissed.

17

## POINT VII

### BAIUL'S SECTION 51 CLAIM SHOULD BE DISMISSED BECAUSE DISSON'S EMAIL TO MARTIN WAS MERE INCIDENTAL USE OF BAIUL'S NAME AND LIKENESS

A defendant's mere incidental use of plaintiff's name and likeness cannot form a basis for a N.Y.

Civil Rights § 51 claim:

> [N]ot every unauthorized use of an individual' s name in connection with trade or advertising violates the statute. *Damron v. Doubleday, Doran & Co.*, 133 Misc. 302, 303, 231 N.Y.S. 444, 445 (Sup.Ct.1928), aff'd, 226 A.D. 796, 234 N.Y.S. 773 (1st Dept.1929), and aff'd 226 A.D. 796, 234 N.Y.S. 774 (1st Dept.1929). In determining whether a name or likeness is used primarily for advertising or trade in violation of the statute, a court will weigh the circumstances of the use, its extent or degree, and the character of the use. *Id.* Courts in New York are reluctant to impose liability under §§ 50–51 for "incidental" use of a person's name or image because of the danger of "impos[ing] an uncalled-for burden and hazard" on publishers. *Id. See also Preston v. Martin Bregman Productions, Inc.*, 765 F.Supp. 116, 120 (S.D.N.Y.1991).

> Thus, the New York courts have recognized that "incidental use" of a person's name or photograph, even when it is unauthorized and fictionalized, falls outside the prohibition of the statute. *See Ladany v. William Morrow & Co., Inc.*, 465 F.Supp. 870, 880 (S.D.N.Y.1978) (collecting New York cases). This incidental use exemption protects the writers and publishers of books and other materials from liability for "isolated," "fleeting," or "de minimis" uses of a person's name or image. *See University of Notre Dame Du Lac v. Twentieth Century–Fox*, 22 A.D.2d 452, 256 N.Y.S.2d 301, 304 (1st Dept.), aff'd 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965) ("isolated references ... of ... fleeting and incidental nature" do not offend Civil Rights Law); *Stillman v. Paramount Pictures Corp.*, 2 A.D.2d 18, 153 N.Y.S.2d 190, 191 (1st Dept.1956), aff'd 5 N.Y.2d 994, 184 N.Y.S.2d 856, 157 N.E.2d 728 (1959) (§§ 50–51 "do not prohibit the incidental, momentary and isolated use" of a person's name in a fictional movie); *Man v. Warner Bros., Inc.*, 317 F.Supp. 50, 53 (S.D.N.Y.1970) (incidental use of forty-five seconds of plaintiff's performance in film is "de minimis," and not actionable).

*Netzer v. Continuity Graphic Assoc., Inc.*, 963 F.Supp 1308, 1325-26 (S.D.N.Y. 1997) (Sweet, D.J.); *see also Rappaport v. Buske*, No. 98 CIV. 5255, 2000 WL 1224828, *10 (S.D.N.Y. Aug. 29, 2000) (Jones, D.J.) ("It is undisputed that defendants produced and disseminated a single promotional flier for the series, and this flier made no mention of the plaintiff."); *Univ. of Notre Dame Du Lac v. Twentieth Century-Fox Film Corp.*, 22 A.D.2d 452, 454 (1st Dep't 1965) (holding that " isolated references" that are "fleeting and incidental nature" cannot form a basis for a Section 51 claim), *aff'd*, 15 NY2d 940 (1965).

18

Here, as demonstrated above, Disson's single email to Martin on July 12, 2013 with an attachment using Baiul's name and likeness, which was never sent to a consumer nor caused consumer confusion, was clearly "isolated," "fleeting," and "de minimis." Therefore, the Court should dismiss Plaintiff's First Cause of Action in the NBC Action.

### POINT VIII

### BAIUL IS NOT ENTITLED TO DISSON SKATING'S ALLEGED PROFITS PURSUANT TO THE LANHAM ACT OR SECTION 51

Where a plaintiff "has failed to present evidence that the defendant benefitted from" defendant's use of plaintiff's name and likeness, "the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. § 1117(a)." *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 465 (5th Cir. 2001). In determining whether a plaintiff is entitled to defendant's profits, a Court must determine "the degree of certainty that the defendant benefitted from the unlawful conduct ...." *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F2d 1532, 1540 (2d Cir. 1992) ("there is nothing to suggest that Blue Coral's EVER BRITE sales were at Basch's expense"); *see also Merck Eprova AG v. Brookstone Pharm.*, LLC, 920 F.Supp.2d 404, 431 (S.D.N.Y. 2013)(Sullivan, D.J.)(holding same).

Here, the defendant in the NBC Action is Disson Skating, which is not even the company that produced and earned income from the Disson Shows. Furthermore, there is no evidence that Disson's single email to Martin on July 12, 2013 with an attachment using Baiul's name and likeness, which was never sent to a consumer nor caused consumer confusion, caused any profit whatsoever for *non-party* Disson PA. None of the income generated from the Disson Shows was in any way caused by *non-party* Disson PA's extremely limited use of Baiul's name and likeness. *See* D.56.1 at ¶ 105; Disson Decl. at ¶ 6. At the time that all of the sponsors for the Disson Shows agreed to be sponsors, they all had been informed of the current skating cast list, which did not include Baiul. *See* D.56.1 at ¶ 105; Disson Decl. at ¶ 6.

Therefore, Baiul is not entitled to any profits of Disson Skating under the Lanham Act.

Baiul is also not entitled to an award of any profits of Disson Skating pursuant to N.Y. Civil

Rights Law § 51 because that statute only "permits compensation for a plaintiff's actual monetary damages

..." *Marshall v. Marshall*, No. 08 CV 1420 LB, 2012 WL 1079550, * 27 (E.D.N.Y. Mar. 30, 2012), *aff'd*,

504 Fed.Appx. 20 (2d Cir. 2012), not attorney's fees.

Consequently, any claim by Baiul for Disson Skating's profits should be dismissed.

## POINT IX

### BAIUL'S LANHAM ACT AND SECTION 51 CLAIMS SHOULD BE DISMISSED BECAUSE SHE HAS FAILED TO ESTABLISH ANY DAMAGE FROM DISSON'S JULY 12, 2011 EMAIL

A Court may not award compensatory damages under Section 51 if plaintiff fails to "present any

evidence of his economic damages related to defendant's use of his image." *Marshall*, 2012 WL 1079550,

at * 27. The same holds true for the Lanham Act. *See Dor Yeshurim, Inc. v. A Torah Infertility Medium

of Exch.*, No. CV 10-2837, 2011 WL 7285038, *7 (E.D.N.Y. Aug. 10, 2011) ("Section 1117(a) allows

plaintiff to recover its damages attributable to defendant's violations. Plaintiff has not, however, submitted

any documents that support a loss in profit, nor has plaintiff suggested an amount in monetary damages.

Although plaintiff's complaint mentions loss of reputation and goodwill as a result of defendant's

infringing conduct, plaintiff has failed to provide any evidentiary support for damages on this basis."),

report and recommendation adopted, 2012 WL 464000 (E.D.N.Y. Feb. 10, 2012).

Furthermore, summary judgment is appropriate when plaintiff's damages are merely speculative.

*See Sellify Inc. v. Amazon.com, Inc.*, No. 09 CIV 10268 JSR, 2010 WL 4455830, * 5 (S.D.N.Y. Nov. 4,

2010) (Rakoff, D.J.) ("[T]he Court observes that, even if any of its liability claims were otherwise viable,

Sellify's asserted damages are far too speculative to survive a motion for summary judgment. *** Sellify's

failure to adduce a non-speculative basis for its alleged damages is therefore an independent and adequate

ground for granting the motion."); *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F.Supp.2d

305, 319 (S.D.N.Y. 2008) (Cedarbaum, J.) (holding same).

Here, Baiul has failed to establish any damages because she fails to prove damages specific to Disson's July 12, 2011 email. *See* D.56.1 at ¶¶ 163-166; Ex. LL at BAIUL 723-724 and 733 to 734; Ex. J at 262:9 to 266:20; Ex. G at 386:7 to 389:3; 395:7 to 398:22. According to Plaintiffs' Rule 26(a)(1) Initial Disclosures in both above-referenced actions (Ex. LL), Baiul's damages for both the Disson Action and the NBC Action are based upon the same exact calculations. *See* Ex. LL at BAIUL 723-724 and 733 to 734. Therefore, Baiul does not separate damages caused by the July 12, 2011 email from any other alleged conduct of Defendants alleged in the Disson Action and the NBC Action, nor for each cause of action in each of those two actions. *See id.* Baiul's business manager, Farina, confirmed this in his deposition. *See* Ex. J at 262:9 to 266:20.[4]

Furthermore, Baiul's alleged damages are based upon pure speculation. Both Baiul and Farina testified that Defendants' alleged conduct in both actions caused her phone to stop ringing, namely that since Defendants' conduct, she purportedly has not received offers and that she purportedly received offers prior to Defendants' alleged conduct in 2011. *See* Ex. G at 160:20 to 162:15 and 307:20 to 308:6; Ex. J at 354:18 to 357:10; 359:12 to 361:6; 363:17 to 364:3.

However, between 2007 and 2010, Baiul only remembers receiving one offer for a paid skating show. *See* Ex. G at 165:9 to 166:14.[5] According to Baiul, she only performed in "a couple" skating shows between 2006 and 2011 for which she was paid. Ex. G at 440:19-21. Baiul also admits that she did not do a single skating show in 2011 for which she was paid. *Id.* at 443:18 to 446:24; *see also* Ex. H. Baiul also testified that she only did one paid skating show in 2010. *See* Ex. G at 487:4 to 492:19; Ex. I. Farina

---

[4]     Baiul testified that one would have to ask Farina, not her, for information concerning her alleged damages purportedly caused by the Defendants' alleged conduct in the Disson Action and the NBC Action. *See* Ex. G at 386:7 to 389:3; 395:7 to 398:22.

[5]     Between 2007 and 2010, Farina was not her manager and thus has no knowledge of what phone calls or offers Baiul received for that time period. *See* Ex. J at 361:13 to 363:16.

confirmed these facts in his deposition. *See* Ex. 302:14 to 304:14. Therefore, based upon the foregoing, Baiul has no evidence that she regularly performed in paid skating shows from 2006 through 2011.

Additionally, Baiul calculated her alleged damages on an earnings estimate chart ("Earnings Chart"). *See* Ex. LL at BAIUL 723-724 and 733-734. According to the Earnings Chart, Baiul allegedly earned or should have earned $53,742,096 from 1994 though 2011. *See id.* However, a large portion of these alleged earnings – $44,172,251 – relate to what she allegedly *should have been paid* by her prior agents, William Morris Agency ("WMA") and IMG. *See* Ex. LL at BAIUL 723-724 and 733-734 at columns "WMA-Unreported and Unpaid," "WMA– Interest Due on Unpaid, "2nd Agency– Unreported and Underpaid," and "2nd Agency– Interest Due on Unreported and Underpaid." *See also* Ex. J at 319:25 to 320:13; 346:6-23; 389:25 to 390:23. There is simply *no* proof in the record, or in documents produced by Baiul, that Baiul *should have earned* $44,172,251 from 1994 though 2011.

Moreover, Farina testified that the column entitled "WMA-Unreported and Unpaid," which totals to $18,039,855 ("Column Three") is based upon alleged residuals and royalties that she allegedly *should have received* and income that she allegedly *should have received* from a company named Sony Signatures. *See* Ex. LL at BAIUL 723-724 and 733-734 at footnote *3; *see also* Ex. J at 322:19 to 324:24. However, Baiul has not produced *any* documents in these two actions to support any alleged residuals and royalties that she allegedly *should have received* or any alleged income from Sony Signatures that she *should have received*. *See* Ex. J at 327: 4 to 328:21; 329:7-25.

Column Three is also based upon television commercial sales for the movie "A Promise Kept: The Oksana Baiul Story," which Farina estimates to be $4,000 per commercial. *See* Ex. LL at BAIUL 723-724 and 733-734 at footnote *3; *see also* Ex. J at 428:18 to 431:19. However, Baiul has not produced *any* documentation to support Farina's $4,000 per commercial number. *See* Ex. J at 431:20 to 444:22.

Column Three is also based upon income from the television production "The Nutcracker on Ice." *See* Ex. LL at BAIUL 723-724 and 733-734 at footnote *3; *see also* Ex. J at 322:19 to 324:19. However, Baiul has not produced *any* documentation to support any alleged income from "The Nutcracker on Ice." *See* Ex. J at 327:7-11; 449:16 to 450:10.

Plaintiffs' Earnings Chart also estimates Baiul's earnings at an "Average Per Year" amount of $1,539,428 (*see* Ex. LL at BAIUL 723-724 and 733-734), which would have been earned by Baiul's "loan out" entity Oksana, Ltd. *See* Ex. J at 364:4 to 365:9. However, Oksana, Ltd.'s tax returns for 2007 through 2011 show that Oksana, Ltd. never had gross income above $109,000 and only had gross income of $3,131 for 2011, $5,973 for 2010 and $4,778 for 2009. *See* Ex. MM. Hence, any purported "Average Per Year" earnings in the alleged amount of $1,539,428 is directly contradicted by Oksana, Ltd.'s own tax returns.

According to the Earnings Chart, Baiul is claiming that Defendants' alleged conduct has caused Baiul $115,000 per year in "Compensatory Damages." *See* Ex. LL at BAIUL 723-724 and 733-734. This $115,000 per year amount is more than Oksana, Ltd. earned in *total* gross income for years 2008 through 2011 *combined*, which is $45,972 ($32,090 [2008] + $4,778 [2009] + $5,973 [2010] + 3,131[2011]). *See* Ex. MM. This $115,000 per year amount is also more than Oksana, Ltd. made for its best year between 2007 and 2011, namely 2007 for $108,668. *See id.*

Farina also arrived at the $115,000 per year amount by multiplying his estimated $1,539,428 "Average Per Year" amount by 7.47%. *See* Ex. J at 352:4 to 353:16. However, Farina admits that 7.47% was just a "random" percentage. *Id.* at 354:20-22 ("Q. Who came up with the percentage 7.47? | A. It was conservative and, quite frankly, just a bit random."). Therefore, Baiul's $115,000 per year amount of compensatory damages, which is based upon the 7.47 percentage, is necessarily based upon a "random" calculation by Farina.

Consequently, Baiul has no non-speculative evidence of being damaged by Disson's July 12, 2011

email and her Lanham Act and Section 51 claims (Causes of Action One and Two) should be dismissed.

## POINT X

### BAIUL HAS NO EVIDENCE TO SUPPORT HER NEGLIGENT MISREPRESENTATION AND FRAUD CLAIMS

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Lamb v. Money Transfer Sys., Inc.*, No. 12-CV-6584, 2013 WL 5216442, \*14 (W.D.N.Y. Sept. 16, 2013) (quotations omitted). "The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Batra v. Elec. Land Services, Inc.*, No. 52629/2011, 2013 WL 5607243, \* 8 (Sup. Ct. Westchester Oct. 7, 2013). Here, Baiul has zero proof that Disson Skating ever made any false statement or material omission to her upon which she reasonably relied that caused her any injury, let alone facts to support the remaining elements of these claims. *See* D.56.1 at ¶¶ 98-104.

In the NBC Action, Baiul bases her Fraud and Negligent Misrepresentation Causes of Action upon May 2012 correspondence between Baiul's former counsel and NBC. *See* Ex. D at ¶¶ 42-55. The first part of this correspondence was a letter sent from Baiul's former counsel to NBC. *See* Ex. II. This letter was not sent to *non-party* Disson PA or Disson Skating. *See id.* Lusins, in-house counsel for NBC, sent Baiul's prior counsel a response letter on May 25, 2012, which also was not sent to *non-party* Disson PA or Disson Skating. *See* Ex. Y. Thus, based upon the foregoing, neither *non-party* Disson PA nor Disson Skating participated in this correspondence between Baiul and NBC. *See* Exs. II and Y. In fact, Lusins testified that Disson's company was not in any way involved in the drafting or sending of her May 25,

2012 letter. *See* Ex. JJ at 73:5 to 74:10.

Thus, the very document that Baiul alleges is the basis of her negligent misrepresentation and fraud claims did not come from any Disson company nor was any Disson company in anyway involved with its drafting or sending. Furthermore, Baiul testified that the May 25, 2012 letter did not contain any false statement or omitted any material fact. *See* Ex. G at 231:15 to 235:8.

Therefore, Baiul's negligent misrepresentation and fraud claims (Causes of Action Three and Four) are baseless and should be dismissed.

### POINT XI

### "SPOLIATION OF EVIDENCE" IS NOT A CAUSE OF ACTION, THUS BAIUL'S FIFTH CAUSE OF ACTION IN THE NBC CASE SHOULD BE DISMISSED

There is no recognized cause of action for spoliation of evidence under New York law. *See Landis v. Remington Arms Co., Inc.*, No. 8:11-CV-1377, 2012 WL 6098269, * 2 (N.D.N.Y. Dec. 7, 2012) (citing numerous cases). Regardless, Baiul's bases her spoliation claim upon Disson Skating purportedly removing alleged material that named her as a performer in one of the Disson Shows from the Disson website – all of which has no merit. *See* Ex. G at 201:3 to 202:11.In fact, Baiul was never listed as a performer for the Disson Shows on this website and Baiul has no proof to the contrary. *See* D.56.1 at ¶¶ 90-97. Furthermore, Baiul admitted that she does not even "know who physically destroyed evidence." Ex. G at 202:9-11. Thus, Baiul's "spoliation of evidence" claim in the NBC Action (Fifth Cause of Action) should be dismissed.

### CONCLUSION

For the foregoing reasons, Disson Skating and Disson respectfully request that the Court grant their motions for summary judgment, dismiss all claims against them with prejudice in the Disson Action and NBC Action, and grant such further and other relief as the Court deems just and equitable.

25

Dated:  New York, New York
        October 24, 2013

                                                 Yours, etc.,
                                                 TACOPINA, SEIGEL & TURANO, P.C.

By:  _____
                                                 Joseph Tacopina, Esq.
                                                 Matthew G. DeOreo, Esq.
                                               275 Madison Ave., Fl. 35
                                                 New York, New York 10016
                                                 Tel: (212) 227-8877
                                                 Fax: (212) 619-1028
                                                 *Attorneys for Defendants Stephen Disson*
                                                 *and Disson Skating, LLC*